HATFIELD v. STATE OF INDIANA.

[No. 29,982. Filed June 18, 1962. Rehearing denied September 25, 1962.]

*Charles E. Hughes,* of Elkhart, for appellant.

*Edwin K. Steers,* Attorney General, and *Richard C. Johnson,* Deputy Attorney General, for appellee.

LANDIS, J.—Appellant was indicted for the first degree murder of his wife, and after a trial by jury was convicted as charged, and sentenced to death. He appeals from the judgment and has assigned as error the overruling of his motion for new trial.

Appellant's first contention is that one of the jurors, one Glenn Monk, was guilty of misconduct in that each day of the trial he had been taking on an average five pills or capsules of certain tranquilizing drugs known as placidyl, phenobarbital, and belladonna, to relieve his mental tension and stress and induce sleep, that said juror during the course of the trial and for some four years prior thereto had been under the care of a psychiatrist and physicians for acute mental strain and tension, all of which was unknown to appellant and his attorney, and which allegedly interfered with the discharge of such juror's duties and allegedly deprived appellant of a fair trial.

Appellant further alleges that on the voir dire examination of the jurors the said Glenn Monk was asked by appellant's attorney whether he knew of any reason why he could not serve as a fair and impartial juror, to which he replied he did not, when the contrary was true in view of his said mental strain and taking of drugs as aforesaid.

In support of his motion for new trial raising this question, appellant filed affidavits of his attorneys, Robert Hepler and Charles Hughes, and a layman and a physician who answered a hypothetical question as to the effect of tranquilizers and barbiturates upon

individuals. The State (appellee) filed counter affidavits of three physicians, one layman, the court bailiff, and the juror, Monk. At the hearing on the motion for new trial two additional laymen testified for the appellant. Thereafter such motion for new trial was overruled.

Appellant argues that the affidavits and testimony submitted on his motion for new trial were to the effect that the juror Monk for three years prior to the trial had a chronic nervous condition characterized as anxiety reaction and depression; that he had been under the care of medical doctors and a psychiatrist who had prescribed tranquilizers, phenobarbital, belladonna, and various sedative compounds, and approximately three months prior to the trial had placed himself, upon the recommendation of his psychiatrist, in a private sanitorium in Florida. A medical doctor, who apparently had not examined the juror Monk, stated that such drugs in the usual doses would not be expected to have an adverse effect on a person's reasoning or judgment, but that an increased dosage might do so.

However, in opposition to the motion for new trial, two medical doctors (Dr. Galen Miller, the coroner, and Dr. John Keating) gave evidence as to their treatment of the juror Monk professionally. Dr. Miller saw the juror before and during the trial, and Dr. Keating saw him prior to trial and soon afterward. Both doctors had prescribed the drugs for Monk and stated he was rational and his mental processes were not clouded. Dr. Miller stated that in his opinion the drugs did not affect his mental process, and Dr. Keating discussed the question of jury service with Monk before the trial. He advised Monk to respond to duty and that there was no reason he

shouldn't serve on the jury; he further stated Monk, in his opinion, had normal comprehension and judgment during the trial.

Appellant and appellee offered conflicting evidence of laymen as to the juror's taking of pills on other occasions than the trial, and as to whether the juror on those occasions was coherent or incoherent and rambling in conversation.

It is of course fundamental to our system of jurisprudence and guaranteed by our federal and state constitutions that an accused in a criminal case is entitled to a trial by jury. This necessarily contemplates a fair and impartial trial before a panel of competent jurors.

It appears uncontradicted that at the time of trial neither appellant nor his counsel had any knowledge that the juror Monk had a nervous condition that he was taking tranquilizing drugs under the direction of a psychiatrist and physician. Appellant's counsel therefore could not be expected or required on the voir dire examination to ask of the juror Monk or the other 80 prospective jurors who were examined in this cause, specific questions about their health and physical condition when he had no reason to believe such questions pertinent. The question asked all the prospective jurors by appellant's counsel, "Do you know of any reason why you could not sit on this jury as a fair and impartial juror and render a decision in this cause?" to which all such jurors including Monk replied in the negative, should, we believe in this case, be considered a sufficient interrogation of the jurors in this respect.

We proceed now to a consideration of the question of whether appellant was deprived of a fair trial by the alleged misconduct of the juror who failed to

divulge on the examination the facts of his nervous condition and his taking of tranquilizing drugs under the direction of physicians.

Appellant has cited the Indiana cases of *Davis* v. *The State* (1871), 35 Ind. 496, 9 Am. Rep. 760, *Brown* v. *The State* (1894), 137 Ind. 240, 36 N. E. 1108, 45 Am. St. Rep. 180, and *Cheek* v. *The State* (1871), 35 Ind. 492, in support of his position.

The Davis case was a first degree murder case in which the bailiff in charge of the jury went with two of the jurors to a saloon, where they had at least " . . . 'a drink of brandy, ginger wine, nutmeg and sugar,' . . ." The amount of liquor consumed is not indicated, nor does it appear where the other jurors were at the time. This all occurred after the jury had been instructed and had received the case to deliberate on the verdict. Although it was not shown what effect the separation and drinking had on deliberation, it was held such misbehavior was sufficient to set aside the verdict, and the judgment was reversed.

The Cheek case was one in which two of the jurors took notes on the evidence over appellant's objection and after the court told them not to do so, and was held to be misconduct.

In the Brown case one juror became intoxicated for two hours after the jury was separated for the day. The juror resumed his seat the next day, and the Court on appeal held that while drinking alcoholic beverages during a recess of the court might not be such misconduct as to vitiate the verdict, nevertheless where a juror drinks to such a point as to become intoxicated, such conduct renders the verdict invalid. The Court stated that it need not determine how long the juror remained intoxicated nor to what extent his mental processes were beclouded, but that

upon proof of intoxication, in order to be safe, it must reverse.

Appellant has also cited *State* v. *Murphy* (1960), 56 Wn. 2d 761, 355 P. 2d 323, wherein it appears that a medical trusty at the jail gave defendant tranquilizers before he took the stand, and as a result he appeared cool, lackadaisical and indifferent throughout. This, it was claimed, helped convince the jury they should impose a death penalty. The Court held this to be prejudicial and to warrant a reversal.

We do not believe the factual situations in the foregoing cases relied upon by appellant are analogous to the case at bar. Each of the cited cases involved definite misconduct which appeared likely to have a material effect on the outcome of the trial and thus to prevent the accused from having a fair and impartial trial. The use of intoxicating liquor or drugs by jurors or persons at their own personal discretion and volition cannot properly be compared to the taking of tranquilizing drugs by a juror under a physician's advice and direction and under the circumstances as appear in the case before us. Here it is particularly significant that the uncontradicted medical testimony (the evidence of two physicians) was to the effect that the prescribed dosage of the drugs did not affect the juror Monk's mental processes, but that he was rational and his mental functions were not clouded. One of the doctors in fact discussed the question of jury service with Monk and specifically advised him to respond to jury service. He further stated that Monk, in his opinion, had normal comprehension and judgment during the trial. This expert testimony was certainly not refuted by the evidence of several of the lay witnesses offered by the defense to the effect that on other occasions removed from

the time of trial the juror's use of the drugs and their effect on him had appeared excessive and abnormal.

We are compelled to conclude upon the evidence of the case before us that the trial judge who presided over the cause below and observed the witnesses and jurors, did not err in overruling appellant's motion for new trial on the grounds of the juror's alleged misconduct and that his physical and mental condition and use of drugs deprived appellant of a fair trial.

Appellant's remaining contention is that the court erred in admitting into evidence over appellant's objectons State's Exhibit 3, which is a photograph of the body of the deceased, Leave Hatfield, lying on a table at the Elkhart General Hospital.

Appellant's objection to the admission was that prior evidence had been admitted and oral evidence had been given to the jury as to the condition of the deceased, that the evidence was prejudicial and submitted to the jury for that purpose.

Appellant's argument in his brief is chiefly devoted to his contention that the photograph was taken approximately two hours after the doctors performed an autopsy on the body of deceased, although no objection was made at the trial that the photograph was not an accurate representation of the body of the deceased at the time of her death.

The evidence in the record shows that the post mortem examination by Drs. Miller and Hathaway on the body of the deceased began between 9:00 and 10:00 a.m. on the date she was killed. Dr. Hathaway testified the actual autopsy started about 10:00 a.m. and that State's Exhibit 3 was taken at the time he was doing the autopsy. Dr. Miller, the county coroner,

testified the State's Exhibit 3 fairly and accurately describes the body before anything was done to it at the hospital. There was a notation on the exhibit indicating it was taken December 6, 1959 at 12:15 p.m. There is testimony that in the autopsy the skull was opened and considerable dissecting was done in the area of the left eye.

Appellant contends from the foregoing evidence it is difficult to reconcile the statement of the coroner, Dr. Miller, with the statement of Dr. Hathaway and with the time the exhibit was taken as shown by the notation on the exhibit as being 12:15 p.m., which he states was some two hours after the autopsy was started by the doctors.

We believe the case at bar is entirely distinguishable from the case of *Kiefer* v. *State* (1958), 239 Ind. 103, 153 N. E. 2d 899, relied on by appellant. In that case this Court held that the admission of two pictures of the deceased showing the hands and instruments of the surgeon inside decedent's chest and additional incisions and stitches by the doctor performing the autopsy constituting foreign and irrelevant matter of a gruesome and inflammatory nature was not proper and amounted to reversible error.

In the case before us the evidence is conflicting as to the precise time when the picture was taken, although it was admittedly taken within a few hours of decedent's death. Neither appellant nor his counsel, however, have made any showing in what particular respect the picture contained any irrelevant or foreign matter which could have been prejudicial to the accused. It is true he cites testimony that in the autopsy the skull was opened and considerable dissecting was done in the area of the left eye.

However, we are not directed to any portion of the exhibit which reveals any such alterations in deceased's appearance and are unable from our examination of the picture to observe any such change in it. Appellant concedes the testimony of Dr. Miller, the county coroner, is to the effect that the exhibit fairly and accurately describes the body before anything was done to it at the hospital.

We are unable to find in the record any evidential support for the argument his counsel is making on appeal that State's Exhibit 3 was inadmissible, and we must conclude the court below did not err in allowing it to be introduced in evidence.

The judgment is affirmed.

Bobbitt and Achor, JJ., concur.

Arterburn, C. J., concurs with separate opinion.

Jackson, J., dissents with opinion.

### CONCURRING OPINON.

ARTERBURN, C. J.—I concur in what is said in the majority opinion in this case, except its reference to the case of *Kiefer* v. *State* (1958), 239 Ind. 103, 153 N. E. 2d 899. The reference seems to infer that any picture of a body or victim which reveals that a surgeon performed an autopsy would contain "irrelevant matter of a gruesome and inflammatory nature" and would not be admissible. In my opinion, that is not the rule by which admissibility of evidence is determined. 2 Wharton, Criminal Evidence, pp. 654-655, §686 says:

> "When otherwise admissible, it is no objection that a photograph is gruesome, or likely to inflame or prejudice the jury. A photograph otherwise admissible is therefore not to be excluded even though it shows a garroted child with his

hands and feet cut off to prevent identification, or the naked or decomposed body of the victim."

If the physician here may testify that there was an autopsy and what he did with reference to the autopsy; that the skull was opened and dissecting was done in the area of the left eye for the purpose of determining the cause of death or any other relevant matter, then certainly a picture of what he described he did would be admissible.

As a general rule, pictures are admissible even though some changes have occurred in the object pictured or in the surroundings, if they still may give the jury some information on a relevant point. In the leading case in this state, *Hawkins* v. *State* (1941), 219 Ind. 116, 37 N. E. 2d 79 a photograph was taken of a murdered victim's decomposed body a number of months after he was killed. There was a change in the seasons, the foliage and other details had changed from the time of death, yet this court approved the admission of such photographs, since they were relevant although gruesome.

We do not wish to have it inferred by our approval of the majority opinion in this case that pictures which show an autopsy has been performed, which have as their purpose to discover the cause of death or any other relevant matter, are inadmissible in a criminal case because they may appear gruesome or prejudicial.

### DISSENTING OPINION.

JACKSON, J.—It is apparent from the record in this case that the court committed reversible error in overruling appellant's motion for a new trial.

The record discloses that one of the jurors was, at, prior, during and after the trial a depressed chroni-

cally nervous person, under medical and psychiatric treatment, an inmate of a rest sanitorium, and addicted to the use of tranquilizers and drugs. Certainly he cannot be said to be a qualified, capable and competent juror under those circumstances.

The judgment of the trial court should be reversed, and the cause remanded with instructions to sustain appellant's motion for a new trial.

NOTE.—Reported in 183 N. E. 2d 198.